Eddy R. McDuff v. Commissioner.
McDuff v. Commissioner
Docket No. 112606.
United States Tax Court
1944 Tax Ct. Memo LEXIS 134; 3 T.C.M. (CCH) 882; T.C.M. (RIA) 44282; August 21, 1944
*134 H. A. Mihills, C.P.A., 917 Munsey Bldg., Washington, D.C., and Carl B. Callaway, Esq., for the petitioner. Elmer L. Corbin, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In this proceeding petitioner challenges asserted deficiencies of $180.15, $1,093.12, $616.30, $2,485.99 and $7,199.14, in his income tax for the years 1936, 1937, 1938, 1939 and 1940, respectively. The primary question presented is whether petitioner is entitled to report all or certain parts of the income for the years in question on a community property basis. An alternative question is whether the deficiency determined for 1937 is barred by the statute of limitations. Findings of Fact Petitioner, an individual, filed his tax returns for the periods here involved with the collector for the second district of Texas. Petitioner was born in Pueblo, Mexico, on February 11, 1900, and was registered at birth as an American citizen by his father who was an American citizen born in Alabama. At the time of his death petitioner's father was living in Dallas, Texas. In 1902 petitioner moved to Ft. Worth, Texas. Subsequently he moved to Jacksonville, Texas and in 1914 to Dallas, *135 Texas. He received all his schooling in those cities. In 1916 he first started to work, and in 1919 he married. His wife was also born and reared in Texas. In 1921 petitioner commenced work in Dallas for Ernst & Ernst, public accountants, working for them until some time in 1926. After being with them a few years he specialized in cases that involved cash shortages. During that time most of his jobs involved his being assigned to other firms temporarily and then returning to Ernst & Ernst. In 1926 J. W. McEachren, an employee of Ernst & Ernst, who had studied the affairs of Sanger Bros., a department store located in Dallas, Texas, arranged for petitioner to leave Ernst & Ernst to become comptroller of that store. Sanger Bros. had been having financial difficulties for some time, being managed by a group of relatives, and it appeared advisable to obtain new management with an imparital view. The problems facing petitioner in taking this job were similar to those which he had handled as an employee of Ernst & Ernst. Petitioner completed his engagement with Sanger Bros. in the latter part of 1927 and then went to Fort Worth, Texas to operate a clothing store in which he previously *136 had had an interest along with other people. Petitioner's associates in the Fort Worth business insisted that he take over the active management of the business which he did for a period of about one year. He then felt that this position was too small to engage in permanently, and in 1929 he accepted a position with Isaac Baker & Son, a men's store at Erie, Pennsylvania. His task on this assignment was to educate the son of the owner of the store in its management. The purpose was accomplished in November, 1929, and petitioner returned to Dallas, where he accepted employment with the Shaw Jewelry Company of that city. He remained with the latter firm for about six years. From 1915 to 1935 petitioner resided continuously in Dallas, Texas, except for one year when he worked in Fort Worth, and for several months when he worked in Erie, Pennsylvania. In 1935 J. W. McEachren, still an employee of Ernst & Ernst, after making a study of Grinnell Bros., a store in Detroit, Michigan, recommended to the officials of that company that they hire petitioner to aid in the solution of certain managerial difficulties. At the same time McEachren advised petitioner of his recommendation and outlined *137 the problems facing that concern. Grinnell Bros. sold musical instruments, having their main store in Detroit but with several nearby branch stores. The original founders of the store were brothers and their descendants and collateral relatives owned the controlling stock in the company in 1935. The owners at that time had been operating the business through a committee, having a representative of each branch of the family. Inefficient management resulted. The problems presented were similar to those with which petitioner had previously dealt. As a result of this and McEachren's recommendation a conference between petitioner and representatives of the company resulted in petitioner's accepting on an annual basis the position of comptroller of Grinnell Bros. Petitioner commenced his duties on September 15, 1935. Prior to this time McEachren had made several other similar suggestions and recommendations to petitioner and various firms but none had materialized. When petitioner accepted the position with Grinnell Bros. he considered it as a temporary trouble-shooting job. His first title was "comptroller." While originally he assumed his task would require at least one year for completion *138 he intended, at the time he accepted it, to return to Texas when it was completed. As the job was not complete at the end of one year petitioner continued on with Grinnell Bros. on the same basis until an adjustment was made in 1937, when he was made vice-president and general manager of the company. Petitioner's salary was increased at that time though he continued to be hired on an annual basis. During his first two years there he concerned himself exclusively with the financial side of the business, reducing expenditures and setting up an accounting system to reflect accurately the operations which were taking place. During this period while costs were reduced and profits instead of losses were shown, sales did not increase materially. After the 1937 adjustment he was given authority over merchandising as well as financial policies. By 1936 petitioner felt that maximum efficiency in the operation of the company could be attained only if control of the stock was brought into the hands of one branch of the family. He so advised Robert Meginnity, the husband of a descendant of one of the founders, who represented the branch of the family then having the largest stock interest. The *139 second largest interest in the company was held in a trust estate and Meginnity made the latter an offer to purchase their interest at $25 per share in 1936. This offer was rejected but had it been accepted the Meginnity group would have acquired control of the corporation. Subsequently, the trust estate agreed to sell its shares under a contract negotiated by petitioner. The purchasers under this contract, dated December 5, 1938, were referred to as E. R. McDuff and Associates, because petitioner had negotiated the contract. At the time of the sale there were approximately 44,728 shares of Grinnell Bros. stock outstanding. By the contract the trust estate was to sell 12,969 shares at a price of $30.75 per share. One hundred sixty-nine shares were to be paid for in cash and the remaining 12,800 shares to be purchased as follows: 1,000
shares by I. L. Grinnell who was to pay
$10,000 in cash, giving a note for the
balance,
1,000
shares by E. R. McDuff who was to pay
$10,000 in cash, giving a note for the
balance, and
10,800
shares by Robert Meginnity and wife
who between them were to pay $178,050
in cash and were to give notes for the
balance of their individual purchases.
*140 Each purchaser was to endorse the shares transferred to him and place them in escrow as collateral for his note. The notes were payable on or before five years from their date and bore interest at the rate of 5 per cent. The purchasers other than petitioner wanted assurance, at the time they entered into the contract, that the company would be well managed during the period in which payments were to be made. Meginnity would not have made the purchase had he not had a tacit understanding with petitioner that the latter would stay with the firm for a reasonable length of time. These considerations at least partly motivated a contract with petitioner providing for his services for a period of five years. That contract was entered into on March 7, 1939, and was made retroactive to January 1, 1939. It provided that petitioner was to be general manager of the company at a salary of $15,000 per year plus a bonus of 5 per cent of the annual net operating profit. His duties were to be the same as they had been after he was made vice president except that he was to have greater authority in carrying them out. Petitioner felt that it would be desirable for him to buy some of the stock personally *141 so that the other purchasers would have more confidence in his judgment. This motivated his participation in the purchase plan. In addition to the 1,000 shares purchased in 1939, petitioner subsequently acquired 300 additional shares from minor employees of the company. His total investment approximated $38,000 and in addition, at about the time of the 1939 purchase, Meginnity gave him a 5-year option to purchase an additional 1,000 shares at $30.75 a share. The latter was not in writing and was never exercised. At the time petitioner received the offer to go to Detroit with Grinnell Bros. he and his brother-in-law, Harold Padgett, were partners in a real estate business in Texas. As a result of that business petitioner was indebted on various notes and he was prompted to accept the Grinnell offer in order to assure his ability to meet his obligations on the notes. His wife knew that acceptance involved living in Detroit but she agreed to do so with the understanding that it was a temporary arrangement. Officials of the Grinnell Company also understood that petitioner was coming to them on a temporary basis as a trouble-shooter. At all times prior to the 1939 contract petitioner *142 was employed by Grinnell on an annual basis. When petitioner's services under the 5-year contract expired in December 1943, Meginnity approached him with the idea of renewing it but was met with complete silence by petitioner. Prior to leaving Dallas petitioner and his wife owned their own home there. Upon their departure they rented it furnished until 1940 when they sold it because petitioner was not able to give it sufficient attention and it was deteriorating, and because they desired a different type of home in which to live upon their return to Texas. Most of the furniture in the old home was sold with the house and part stored with petitioner's brother-in-law in Dallas. After the sale he designated another piece of residence property in Dallas, which he owned at the time, as his homestead. Up to 1944, he had not lived in his home which is occupied by tenants. During the entire time petitioner has been in Detroit he has lived in a hotel or a furnished apartment on a month-to-month basis, never acquiring any real property in Michigan. The furnishings in the leased premises were supplemented by a sofa, piano, china, chair and odd pieces, owned by petitioner, some of which were *143 brought from Texas. He and his wife have both desired to live on a ranch in Texas. His wife, over a period of years, has gotten ideas from various magazines and has purchased furnishings, for such a place, and kept them for future use. Petitioner, on ten or twelve occasions, requested Matt Larkin, a resident of Dallas, who had much experience in purchasing land to be on the look-out for a place which petitioner might purchase for a home. Larkin made some active inquiry but had not pursued the matter for two years before the hearing in February, 1944, as he thought prices were too high. Petitioner, while in Detroit, also wrote for circulars advertising land for sale in the Dallas area and in addition he made inquiries of a man named Stewart relative to the purchase of a farm near Dallas. Mrs. McDuff also frequently requested Larkin to advise them of a ranch suitable for them to live on if he could find one. Her last such request was in December 1943. She would like to build a ranch home in Texas after the War. Several times it was suggested to petitioner by his associates in Detroit that he purchase a home there but he never appeared interested. At least on one occasion he stated *144 that he did not want to have so large an investment in Detroit nor did he desire to move his furniture up there from Dallas. While both petitioner and his wife told their friends that they intended to move back to Texas to live they did not specify a definite time when this would be done. During all the years after September 15, 1935, petitioner and his wife paid poll taxes in Texas each year. Had he not paid the taxes voluntarily they would have become a charge on their real property in the State. Petitioner voted in Texas in the general election of 1940 by absentee ballot and in other years after 1940 voted in local elections also by absentee ballot. He has never voted nor registered to vote in Michigan. Petitioner had two bank deposits in Dallas, Texas after September 15, 1935, and through the years in question, but never in that period did he have any bank accounts in Michigan. During the same time he held a safety deposit box in a Dallas bank and kept his securities there. At no time did he have a safety deposit box in Michigan. Petitioner carred life insurance and certain property insurance and all the policies on each type of insurance held by him were taken out through Texas *145 agents, and premiums were paid there. At no time were any insurance policies taken out or premiums paid through Michigan agents. One reason for the purchase of policies in Texas was to enable petitioner in a case of claims against the company to deal with agents by whom he and his wife were known. After september 15, 1935, petitioner purchased various securities, and all purchases were made through a broker in Dallas. Petitioner and his wife returned to Texas from two to four times annually during the period after September 15, 1935. The purpose of these trips was to visit friends and relatives and to enable petitioner to keep in touch with his real estate affairs in Dallas. While there they would stay with relatives and on these trips petitioner, by personal shopping in Dallas stores, made the great majority of his purchases of personal clothing. During the years after September 15, 1935, petitioner's wife also bought most of her apparel in Dallas. Petitioner and his wife made such purchases in Dallas because they were acquainted with the sales people with whom they dealt and desired to maintain their relationship with them. After September 15, 1935, petitioner continued to hold *146 open and use charge accounts in at least six Dallas stores selling general merchandise or wearing apparel. Mrs. McDuff, a member of the Catholic faith, continued in all the years after 1935 to maintain her church membership in Dallas where she had masses said for her deceased parents. While she attended church in Detroit her principal church contributions were made in Dallas. Petitioner registered for the draft in Dallas in 1917 and again in February 1942. During all the years after 1935 petitioner continued to be a licensed accountant in Texas. He also continued during the same time to be a member of the Texas Bar. In 1932, petitioner and his brother-in-law, Harold Padgett, had formed a partnership to deal in real estate in Texas. Prior to 1935 they had purchased three subdivisions to divide and sell. After 1935 they purchased four subdivisions for the same purpose. The last such purchase was made in December 1943, and consisted of 41 acres suitable for division into 120 to 140 city lots. The purchase price of this land was $31,000. During petitioner's absence from Dallas, Padgett managed the real estate business, consulting with petitioner on important questions by mail, telephone *147 or personal visits. Land purchased was bought and held in the names of petitioner and Padgett. While in Detroit petitioner had signed deeds for land sold and signed notes given in the real estate business. The letterhead of the real estate business read during all the years after September 1935, as follows: "McDuff and Padgett. Real Estate, 2019 Bryan Street, Dallas, Texas." While petitioner's investment represented a two-thirds interest in the business and Padgett's investment a one-third interest, profits were divided on a fifty-fifty basis. Petitioner visited the office of the partnership on his trips to Dallas. The only property owned by Mrs. McDuff is an interest in a printing business in Dallas which she inherited on the death of her mother during the time she was married to petitioner. The printing business is operated as a partnership, Mrs. McDuff and her two brothers, including Harold Padgett, owning equal thirds. The business has grown in recent years and demands more of the time of Padgett who is actively interested in its management. Padgett informed petitioner that because of this he would not be able to give the real estate business all the attention that he thought *148 it required. Petitioner's wife has never abandoned a desire to return to Texas where her two brothers, two sister-in-laws, a nephew, two grandparents and various aunts and uncles live, even though it might mean a financial sacrifice. She and petitioner had a family understanding that they would go back to Texas as soon as certain financial objectives were attained by petitioner in Detroit. Petitioner at the time of the hearing felt that his employment with Grinnell Bros. was going to terminate in the near future but he could not specify a definite time. He felt that before leaving Detroit he should have some means of earning money but that the possibility of making satisfactory arrangements in that respect depended somewhat upon the duration of the War. Both before and after 1939 petitioner had advised Meginnity and I. L. Grinnell, who had purchased the controlling interest in Grinnell Bros., that in his opinion it would be wise for them to build up the company's business and at a propitious moment to sell out as the store was a luxury business and would be hard hit by a depression. Petitioner had expressed to I. L. Grinnell, between 1938 and 1942, an idea which he had of going *149 into business for himself in the event of a depression. His plan was to go into western Texas and buy up the stock of bankrupt stores in various towns and sell them out, moving from one town to another upon completion of the sale. If this plan had materialized it would have necessitated petitioner's living in Texas. Petitioner, during his stay in Detroit also discussed with two accountants the possibility of opening an accounting firm with them in Dallas, Texas, and has never abandoned the idea of carrying out a plan of that nature. Consummation of this plan would have necessitated petitioner's eventual return to Texas. In 1943 petitioner conceived the idea of operating a distributorship in Texas of Stromburg-Carlson radios. He made a definite request to the company for an agreement of this nature, specifying the territory he wished it to cover. He stated to the company that he was willing to put $50,000 to $100,000 in such a business and he knew that this would involve his moving to Texas. The company investigated the possibilities of entering into an agreement with the petitioner but the record does not disclose that an agreement was ever reached. One of the reasons why petitioner's *150 employment contract signed with Grinnell Bros in 1939 was put in writing was that petitioner had expressed to I. L. Grinnell a desire to return to Texas. Matt Larkin, I. L. Grinnell, John W. McEachren and Hal Padgett all had extensive dealings with petitioner during the years in question. They were all of the opinion that during all of those years petitioner definitely intended to return to Texas to live. Petitioner and his wife each filed income tax returns with the collector for the second district of Texas for each of the calendar years 1936, 1937, 1938, 1939 and 1940. Petitioner's return for the calendar year 1935 was filed in Detroit. Mrs. McDuff filed no return for 1935. They reported their income on a community property basis, each reporting one-half of the combined net income. In the table below the items reported each year, the amount reported, the amount of respondent's adjustment and the amounts determined by respondent to be petitioner's correct income are shown as follows: As Filed
Adjustment
Per Respondent
Calendar year 1936: Salary
$ 4,200.04
$ 4,200.04
$ 8,400.08
Partnership income
93.58
93.59
187.17
Rental income
230.97
230.97
461.94
TOTAL
$ 4,524.59
$ 4,524.60
$ 9,049.19
Contributions
$ 25.00
$ 25.00
$ 50.00
Interest
187.21
187.21
374.42
Taxes
87.36
87.37
174.73
TOTAL
$ 299.57
$ 299.58
$ 599.15
NET INCOME
$ 4,225.02
$ 4,225.02
$ 8,450.04
Calendar year 1937: Salary
$ 8,666.06
$ 8,666.06
$17,332.12
Interest
24.26
24.25
48.51
Partnership income
1,524.62
1,524.62
3,049.24
Rental income
191.48
191.47
382.95
Profit on sale of real estate
338.85
338.86
271.08
406.63 *
TOTAL
$10,745.27
$10,338.63
$21,083.90
Contributions
36.00
36.00
72.00
Interest
128.33
128.33
256.66
Taxes
71.73
71.73
143.46
TOTAL
$ 236.06
$ 236.06
$ 472.12
NET INCOME
$10,509.21
$10,102.57
$20,611.78
Calendar year 1938: Salary
$ 7,351.13
$ 7,351.13
$14,702.26
Interest
85.85
85.86
171.71
Partnership income
86.73
86.72
173.45
Rental income
164.67
164.67
329.34
TOTAL
$ 7,688.38
$ 7,688.38
$15,376.76
Contributions
30.00
30.00
60.00
Interest
76.39
76.39
152.78
Taxes
46.03
46.03
92.06
TOTAL
$ 152.42
$ 152.42
$ 304.84
NET INCOME
$ 7,535.96
$ 7,535.96
$15,071.92
Calendar year 1939: Salary
$13,100.76
$13,100.75
$26,201.51
Dividends
1,136.26
1,136.26
2,272.52
Partnership income
1,880.07
1,880.08
3,760.15
Partnership income
779.78
779.78 *
Rental income
150.27 *
150.28 *
300.55 *
TOTAL
$16,746.60
$15,187.03
$31,933.63
Contributions
40.00
40.00
80.00
Taxes
47.08
47.08
94.16
Interest
596.53
596.53
1,193.06
TOTAL
$ 683.61
$ 683.61
$ 1,367.22
NET INCOME
$16,062.99
$14,503.42
$30,366.41
Calendar year 1940: Salary
$17,294.53
$17,294.53
$34,589.06
Dividends
1,947.00
1,947.00
3,894.00
Partnership income
2,588.72
2,588.73
5,177.45
Partnership income
328.78
328.78 *
0
Rental income
31.68 *
31.68 *
63.36 *
350.46
Long-term loss
350.46 *
387.73 *
387.73 *
Ordinary loss
626.39 *
626.39 *
TOTAL
$21,776.89
$20,806.14
$42,583.03
42.50
Contributions
42.50
10.00 *
75.00
Interest
579.14
579.14
1,158.28
Taxes
71.74
71.74
143.48
TOTAL
$ 693.38
$ 683.38
$ 1,376.76
NET INCOME
$21,083.51
$20,122.76
$41,206.27
*151 For each of the years 1936 to 1940, inclusive, the item of salary shown in the column entitled "Per Respondent" in the table above is salary received by petitioner from Grinnell Bros. In each instance under the column "Per Respondent" the item of "Partnership Income" is the income received from the real estate partnership in Dallas of McDuff & Padgett. In each instance where "Rental Income" appears under the column headed "Per Respondent" it represents either a gain or loss sustained in related operations of petitioner in Dallas. Wherever the item "Interest" appears in the "Per Respondent" column it represents interest on a note owned by petitioner and his wife held in Texas and growing out of the sale of some real estate which they had there. The item of $271.08 listed as "Profit on Sale of Real Estate" in the "Per Respondent" column represents profit of real estate which they owned in Dallas and sold in 1937. The two items of "Long-Term Loss" and "Ordinary Loss" listed in the "Per Respondent" column in the respective amounts of $387.73 and $626.39 represent losses sustained by petitioner and his wife on real estate owned by them in Texas and sold in 1940. The items *152 of "Dividends" in the "Per Respondent" column for the years 1939 and 1940 represent dividends received by petitioner on his stock in Grinnell Bros. The partnership income received by petitioner's wife from the Padgett Printing Co. does not appear in the "Per Respondent" column but does appear for the years 1939 and 1940 only in the columns headed "As Filed" and "Adjustment". Under the method employed by the respondent in determining the deficiency asserted against petitioner the income from the Padgett Printing Co. has been eliminated from petitioner's income entirely and included only in the separate taxable income of Mrs. McDuff. These figures as well as those representing losses appear in red. Respondent contends that petitioner was domiciled in Michigan during the years in question and hence was not entitled to report his income on a community property basis for purposes of Federal income tax. Petitioner never intended to give up his Texas domicile or take up a residence in Michigan. At all times during the years 1936 through 1940 petitioner continued to have a present intention to return to Texas to live when his work in Detroit was concluded. Opinion The principal issue is *153 the narrow one of petitioner's domicile for Federal income tax purposes during the five years in controversy. If petitioner was domiciled in Texas, notwithstanding his admitted abode in Michigan, he is concededly entitled to report his entire income on the community property basis and no deficiency will result. We may begin with the proposition as phrased by respondent in his brief: "that the petitioner was a bona fide resident of Texas prior to September 15, 1935, when he entered the employment of Grinnell Brothers, must be conceded. A domicile once acquired is presumed to continue until it is shown to have changed. . However, residence elsewhere repels the presumption, and casts upon him who denies it to be a domicile of choice, the burden of disproving it. ." To quote from , "change of domicile is said to arise where there is change of abode and 'the absence of any present intention to not reside permanently or indefinitely in the new abode.'" When petitioner left Texas and *154 went to live in Michigan, he professed the intention, not only for this record, but in contemporary statements, to make his stay in Michigan temporary and to return to Texas upon completion of his work with Grinnell. Of course, such self-serving statements are not decisive, but before they are disregarded there should be tangible evidence to the contrary. Here, the record is consistent with them, rather than otherwise. Petitioner had a specific assignment to discharge. Similar occasions in the past had resulted in comparatively short-term arrangements. There is nothing to indicate that the original purpose was permanent or even indefinite, and everything to suggest that in 1935 the "change of abode" was viewed as a merely temporary phase. Since later developments were accompanied by no similar physical movements, it may well be that the burden of showing a subsequent change in petitioner's state of mind ought to be imposed upon respondent. The presumption of continuity of a previous domicile is more easily reversed when some physical aspect of abode accompanies the asserted shift in purpose. Cf. However that may be, the events *155 subsequent to 1935 seem to us no less favorable to petitioner's position. When his original task was performed he embarked, it is true, on a new one which equally involved the necessity of his presence in Detroit. But this also could be, and apparently was, dispatched in the space of a short period of years, leading, however, to the necessity, for its accomplishment of a five-year employment contract so that continuity of management could be assured. While this contract existed it could not be said that the duration of petitioner's proposed stay in Detroit was indefinite. True, it has now expired, and the reasons for petitioner's continued participation in the business are not clearly articulated, but it had not yet terminated during the period with which we are here concerned. What the disposition of subsequent questions may be, if any arise respecting the nature of some further purpose for remaining in Michigan rather than returning to Texas, we need not speculate and cannot on this record conclude. It is sufficient to express the opinion that during the years before us petitioner's intention, as indicated by his statements corroborated by the objective facts, was to remain a definite *156 short time in Michigan and then to return to Texas, and during that time to retain his Texas domicile. We may note briefly that no relationships with the new abode were in any degree evidentiary of a permanent or even an indefinitely long stay. In the selection of a home, the maintenance of commercial and business contacts, and the personal, social, political and religious phases of their activities petitioner and his wife gave confirmatory evidence of desiring to maintain close ties with their professed domicile rather than to create new ones. In this respect the distinction from such cases as , is manifest. In short, what we said in , might have been written of this case: The respondent argues that mere indefinite intention can not retain domicile, and cites . Therein the facts disclose that the state of new abode was "the permanent center of practically all of his personal activities"; while herein it is equally plain that Dallas, Texas, the place of former *157 abode, was such permanent center of activity. Indefinite intent, often called "floating" intention to return to former domicile, without more, of course is not sufficient to establish or retain domicile, * * *. "A change of abode with present intent to return to the former abode upon the contemplated happening of an event in the indefinite future, as business dispatched, health recovered, employment ended, employer's recall, is not a change of residence or domicile." ; affd. . * * * The intent to return is definite, the time not greatly indefinite. This shows, in our opinion, the necessary retention of domicile in Dallas. Consideration of the alternative issues is unnecessary, since in any event Decision will be entered for the petitioner. Footnotes
*. Red↩